# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## SOUTHERN DIVISION
## AT LONDON

| | |
|---|---|
| **RANDALL LEWIS, et al.,** | **CIVIL NO. 6:17-CV-38-KKC** |
|     **Plaintiffs,** | |
| | |
| **V.** | **ORDER AND OPINION** |
| | |
| **GERALD JONES, et al.,** | |
|     **Defendants.** | |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on cross-motions for summary judgment. [DE 41; DE 42; DE 43.] Plaintiffs Randall and Tonya Lewis have moved for partial summary judgment on the issue of specific performance and on their breach of contract claim against Defendant Gerald Jones. [DE 41.] Defendants Gerald Jones and Laurel Ridge Landfill, LLC have each moved for summary judgment on all claims being presented against them. For reasons stated below: (1) the Plaintiffs' motion for partial summary judgment is **GRANTED in part and DENIED in part**; (2) Defendant Gerald Jones's motion for summary judgment on all claims is **GRANTED in part and DENIED in part**; and (3) Defendant Laurel Ridge's motion for summary judgment on all claims is **GRANTED in part and DENIED in part**.

## FACTS & BACKGROUND

The Jones family farm covers almost 100 acres in Laurel County, Kentucky. [DE 41-1, at 1-3.] Defendant Gerald Jones became the sole possessor of this property after his mother, Georgia Jones, deeded two tracts of land to him. Jones has owned the main tract of the property since September of 2009 and the rear tract, which borders the Laurel Ridge Landfill, since December of 2010. [DE 41-1, at 2.] Though the Jones family farm has never been

subdivided by deed, the property appears to have three distinct parts. [DE 41-1, at 17; DE 41-11; DE 41-16.] First is the "front 17 acres." [DE 41-1, at 3.] This parcel of land sits east of Highway 552 and abuts Plaintiffs Randall and Tonya Lewis's property. [DE 42-1, at 17.] In his deposition, Jones attested that the 17-acre figure was a rough estimate and that the actual number is likely closer to 19 acres. Nevertheless, at all relevant times, Randall Lewis, Jones, and Laurel Ridge referred to the Jones's property east of Highway 552 as the front 17 acres. The will Court do the same. Although the Jones family once used the front 17 acres for its cattle operation, the land sat idle after Gerald Jones's mother moved to a nursing home. [DE 42-2, at 14-16.]

The residential portion of the Jones family property is called the "middle 52 acres." [DE 41-11, DE 42-2, at 71.] Sitting west of Highway 552, the middle 52 acres includes a five-bedroom brick house and a metal garage. [DE 42-1, at 17.] Together, the front 17 acres and the middle 52 acres form the main tract that was deeded to Jones in September of 2009. Last is the "27 back acres" of the Jones family property. [DE 41-11.] This parcel was deeded to Gerald Jones in December of 2010 and sits adjacent to the Laurel Ridge Landfill. [DE 41-1, at 7.]

Plaintiffs Randall and Tonya Lewis's property adjoins the front 17 acres of the Jones family farm. [DE 41-1, at 1.] The Laurel Ridge Landfill is nearby. [DE 41-1, at 1.] The Lewises maintain a residence, herd cattle, and operate a body shop business on this property. [DE 42-2, at 6.]

By 2013, Jones had moved to Cincinnati and his father, Charles Edward Jones, had died. Jones's mother, however, remained on the farm. [DE 42-1, at 9.] Though he lived and worked in Cincinnati, Jones would frequently return to Laurel County to help her maintain the property. [DE 42-1, at 12.]

Sometime in the fall of 2013, Randall Lewis noticed that Jones was mowing the property. Lewis approached Jones and expressed his desire to purchase the property. There is some dispute as to how the rest of the conversation unfolded, but Jones claims that the communications were vague and that he merely conveyed to Lewis that at some point in the distant future, he would consider disposing of the property. [DE 42-1, at 13-14.] To the contrary, Lewis asserts that Jones said that the front 17 acres were currently for sale and that the rest of the property would be disposed of once Jones's mother left the farm. [DE 42-2, at 17.] According to Lewis, Jones did not have a price in mind at the time but advised that he would soon return with one. Lewis further contends that approximately thirty days after this preliminary conversation, Jones called him and offered the front 17 acres for a non-negotiable price of $59,500 ($3,500 per acre). [DE 42-2, at 18.] As a result of the above conversations, Lewis had an appraisal performed on the front 17 acres began the underwriting process for a loan. [DE 42-2.]

Though the parties differ in their characterizations of these discussions, it is undisputed that on October 8, 2013, the parties executed a document labeled as a real estate purchase contract. [DE 41-6, at 1.] The form document listed Jones and Lewis as the buyer and seller, provided the address of the property, and described the parcel to be sold as a "17 acre farm." [DE 41-6, at 1.] The document also set the purchase price at $59,500, with the entire balance due at closing. No earnest money was required.

It is important to note, however, that the form document had blanks that were never filled in for (1) the buyer and seller's right to terminate the contract within a certain number of days if financing was not approved, (2) the closing date, and (3) the allocation of closing costs. [DE 41-6, at 1.] Indeed, the Defendants suggest that more fields were left blank than were filled in on the form. [DE 43-1, at 12.]

Jones and Lewis did not sign the real estate purchase document in each other's presence. [DE 42-2, at 49.] Nor were their signatures notarized. Instead, the document was simply faxed back and forth between the two parties. [DE 42-2, at 49.] In his deposition, Lewis could not recall who signed the document first or who filled in the document fields. [DE 42-2, at 50.] Nevertheless, Lewis asserts that his attorney prepared a draft deed and scheduled closing for February 24, 2014. [DE 41-1, at 3.] Jones denies having spoken to Lewis's attorney regarding a closing date. [DE 42-1, at 25.]

On December 17, 2013, Farm Credit Mid-America Bank approved Lewis's loan request, granting him an amount of $50,080.50. [DE 41-8.] As part of the underwriting process, the Bank enlisted a law firm to perform a title search on the property. [DE 41-9.] The search revealed that Gerald Jones's property was subject to a lis pendens. [DE 41-9; DE 42-2, at 26.] It was revealed that Jones's mother had initiated an action against him, seeking to invalidate the 2009 and 2010 deeds that she had executed in his favor. Because of the lis pendens, the bank indicated to Lewis that it would be unable to move forward with closing. [DE 41-9; DE 42-2, at 27.]

Lewis renewed his financing for the front 17 acres in June of 2015 and in January of 2016. [DE 42-2, at 28-29.] Lewis claims that he did so on the recommendation of Jones. Specifically, Lewis asserts that Jones had assured him that the lis pendens would be resolved soon and advised him to keep his financing active so the two could close the very moment the legal hold was released. [DE 42-2, at 27.] Jones challenges this account, arguing that he and Lewis never discussed the prospect of renewed financing.

The record reveals that while the lis pendens on the Jones family farm was pending, Jones granted Lewis a lease that enabled Lewis to enter the front 17 acres of the property and make certain improvements. [DE 41-1, at 23.] The parties, however, dispute the motivation behind this arrangement. Lewis claims that it was a concession that allowed him

to prepare for the inevitable transfer of the front 17 acres. [DE 42-2, at 27.] Relying on the lease, Lewis mowed, cut weeds, and removed trees on the property. Jones, on the other hand, claims that the lease had nothing to do with the lis pendens or the property negotiations. Rather, he suggests that the primary purpose of the lease was to grant Randall Lewis access so he could tend to the fence row. [DE 42-1, at 31.]

In December of 2015, Gerald Jones met with Lewis at Lewis's body shop. [DE 42-2, at 68.] Lewis's wife Tonya and his son were also present. [DE 42-2, at 68.] At the meeting, the parties discussed the terms for the sale and purchase of the entire Jones family farm. Jones supposedly stated that he wanted $350,000 for the 52 middle acres using owner financing and wanted to do a like/kind swap involving property that Lewis owned in Harlan, Kentucky.

On December 22, 2015, Jones sent Randall and Tonya Lewis an email that memorialized their previous discussion. [DE 41-11.] Jones began the email by noting that he "just wanted to touch base and get an email so [the parties could] share information." [DE 41-11, at 1.] Jones advised that it was his preference to sell the farm to the Lewises, even though Laurel Ridge had previously offered $500,000 for it. [DE 41-11, at 1.] He then went into the particulars of the potential sale. First, Jones proclaimed that the lis pendens would be removed by January 11, 2016. Second, he explained the benefits of doing a like/kind swap involving the back 27 acres of the Jones property and 109 acres in Harlan, Kentucky that Lewis owned. He noted, however, that the swap was "contingent" on being able to obtain a "building permit to allow a cabin type structure to be built." Third, Jones confirmed that the price of the front 17 acres remained at $59,500. Fourth, Jones indicated a desire to do owner financing for the middle 52 acres. For a principle of $350,000, he suggested a 15-year mortgage at 3.5%. He stated, however, that if Lewis felt differently the two could "research and set to .25 lower than the average bank mortgage." [DE 41-11, at 1.] Lewis claims that upon receipt of Jones's email, he called Jones to accept what he construed as an offer to sell

5

the farm. [DE 42-2, at 78.] Jones, however, denies that this phone call ever took place. [DE 42-1, at 33.]

In early 2016, Lewis attempted to reach Jones on several occasions to check the status of the lis pendens. [DE 42-2, at 33.] Upon using a friend's cell phone, Lewis finally got through to Jones. [DE 42-2, at 33.] Lewis contends that Jones claimed that he was depressed and made several excuses for not keeping Lewis apprised of the status of the legal hold. [DE 42-2, at 81.] Following this conversation, Lewis continued to check in with Jones. On February 29, 2016, Jones sent Lewis an email with the subject heading: "Got you[r] calls, working over the weekend." In this email, he apologized for not answering Lewis's phone calls and explained that he had still not checked the status of the legal hold. He also informed Lewis that he would reach out when he was "emotionally ready" to broach the subject of the land purchase again. [DE 44-9, at 2.] Despite the continued efforts of Lewis, the two would not communicate again until May of 2016.

At or around this time (early 2016), Jones began negotiating the sale of the entire family farm to Laurel Ridge Landfill. [DE 42-1, at 50.] Laurel Ridge had attempted to purchase the property in the past, offering $500,000 to Jones's mother. The deal, however, never closed. [DE 43-12.] Knowing that Jones was now the sole owner of the farm, Laurel Ridge dispatched Nelson Breeden reach out to Jones and begin a dialogue.

On March 1, 2016, Jones sent an email to Breeden advising that he had "been approached by a neighbor who desperately [did not] want a land fill in his front yard." [DE 41-14.] Jones also relayed that he was "waiting to hear from all parties about their potential of a bid to purchase." [DE 41-14.] Laurel Ridge interpreted Jones's email as a request for an offer and sprung into action. Breeden had an appraisal performed on the property and notified Jones of the resulting figure of $350,000. He further informed Jones that the appraisal had been sent to the pertinent parties and that an offer was soon to come. [DE 43-

9, at 3.] In response, Jones expressed his dissatisfaction with the $350,000 figure. However, he indicated that he would wait for Laurel Ridge's offer before continuing the process with other interested parties. [DE 43-9.] Although he personally did not want to see the farm turned into a landfill, Jones relayed to Breeden that he would give Laurel Ridge the opportunity to "chang[e] his mind." [DE 43-9, at 2.]

Laurel Ridge eventually extended Jones an offer of $500,000 for the entire property. On April 8, 2016, Jones countered for $875,000. [DE 41-16.] In support this figure, Jones submitted that the purchase of his property would allow Laurel Ridge to expand their operations "without having to relocate a single asset." [DE 41-16, at 1.] On April 15, 2016, Jones sent Breeden another email, representing that he was standing firm at $875,000. [DE 44-22, at 2.] He also conveyed that he looked forward to Laurel Ridge's future offers but would be "continuing forward with the other interested parties." [DE 44-22, at 2.]

On April 18, 2016, Jones emailed Breeden indicating that he had reached a tentative agreement to sell the farm to a third party. Jones then went through the particulars of his arrangement with Lewis. He informed Breeden of the sale of the front 17 acres, the owner financing of the middle 52 acres, and the like in kind swap for the rear 27 acres. [DE 41-17, at 1.] Jones, however, ended the email by saying, "I'm still offering the entire farm . . . for the firm price of $875,000, but there are no promises or warranties made as to the life of this offer." [DE 41-17, at 2.] Breeden accepted Jones's offer via email on April 20, 2016. Laurel Ridge's attorney, Richard Wood, reached out to Jones and the two began to discuss the particulars of closing. [DE 43-10, at 2.]

On April 22, 2016, Jones emailed Breeden inquiring whether Laurel Ridge had a "lesser desire for the front 17 acres" of the property. [DE 41-19.] Jones informed Breeden that if Laurel Ridge did not buy this specific tract, it would allow the adjacent owner, Lewis, to expand his vehicle repair business. [DE 41-19.] He then advised that if Laurel Ridge was

willing to forgo the acquisition of the front 17 acres, he would reduce the purchase price by the same "amount of the sale to the neighbor - $59,500." [DE 41-19.] Laurel Ridge declined the invitation and the parties executed a sales contract for the entire Jones family property on April 26, 2016. [DE 42-1, at 69.] Closing was set for May 31, 2016.

In late May of 2016, a surveyor for Laurel Ridge went out to the Jones family farm. [DE 43-14, at 4.] Lewis approached the surveyor and told him that he had binding legal contracts for the property. [DE 43-14, at 4.] The surveyor reported his conversation with Lewis to representatives of Laurel Ridge. On May 25, 2016, Richard Wood, Laurel Ridge's attorney, emailed Jones and inquired about Lewis's claims to the property.

That very same day, May 25, 2016, Lewis's father happened to be in the Cincinnati area. [DE 42-2, at 81.] Lewis gave his father Jones's address and told him to stop by and tell Jones to call him. [DE 42-2, at 81.] Lewis claims that once Jones saw his father at the door, he immediately dialed Lewis and told him that entire farm had been sold to Laurel Ridge for $875,000. [DE 42-2, at 81.] After hearing this, Lewis immediately phoned Nelson Breeden of Laurel Ridge. [DE 42-2, at 85.] The parties describe this phone call as very contentious. It is alleged that Lewis told Breeden of his claims and indicated that he would seek legal redress. Lewis did not, however, offer to send Breeden the purported sales contracts. Nor did Breeden ask for them. [DE 42-2, at 86-89.] Lewis suggests that the conversation likely ended with him hanging up.

On May 26, 2016, Jones emailed Wood and Breeden with respect to Lewis's claim to the property. [DE 41-21, at 1.] The email specifically addressed the front 17 acres. Lewis first advised that he was unable to locate the October 8, 2013 real estate purchase document. [DE 41-21, at 1.] He recounted, however, that the one-page document "simply stated the agree to sale amount." [DE 41-21.] Jones then noted that if there was a "legal issue with going forward" the parties would "have to reach another agreement which doesn't include the front

17 acres." [DE 41-21, at 1.] Wood responded to the email and alerted Jones that Laurel Ridge was willing to proceed with the purchase notwithstanding the potential legal issue. [DE 41-21, at 2.] That said, Wood informed Lewis that Laurel Ridge would not be waiving "any claims for breach of contract or otherwise if a claim is made against [it] by Mr. Lewis.". [DE 41-21.] Of note, Wood expressed that "[w]ithout seeing [Jones's] agreement with Randy Lewis, neither [he] nor the title insurance company [could] determine whether the agreement ha[d] expired by its terms or even [rose] to a level of a binding contract to sell the property." [DE 41-21, at 1.] Later that evening, Jones informed Wood of his desire to proceed with the sale and he promised to "obtain a written release from the agreement with Mr. Lewis." [DE 41-21.] The deal closed on May 31, 2016 after the lis pendens was released. Laurel Ridge's title insurance policy included an exception stating that:

> This policy does not insure against rights, claims, or the adverse interests of Randall Lewis under a purported unrecorded contract in and to the property to be insured, and will not cover any legal fees and/or expenses to address of defend said claims. [DE 44-24, at 3.]

In June of 2016, Gerald Jones wrote Lewis a letter that terminated the lease granted on August 4, 2015. [DE 42-2, at 34.] The letter explained that the property had been sold to another party and was no longer available for rent. [DE 42-2, at 34.] Attached to the letter was a check for $2,500 in "consideration for [Lewis's] time and energies." [DE 42-2, at 32.]

Initially filed in Laurel Circuit Court, the action was removed to this Court on February 16, 2017. [DE 1.] Plaintiffs Randall and Tonya Lewis seek specific performance and assert claims of tortious interference with business advantage and unjust enrichment against Defendant Laurel Ridge Landfill and breach of contract, unjust enrichment, negligent misrepresentation, fraud, and tortious interference with business advantage claims against Defendant Gerald Jones. [DE 39.]

<u>ANALYSIS</u>

The parties to this action have now moved for summary judgement. [DE 41; DE 42; DE 43.] Plaintiffs Randall and Tonya Lewis have moved for partial summary judgment on the issue of specific performance and on their breach of contract claim against Defendant Gerald Jones. [DE 41.] Defendants Gerald Jones and Laurel Ridge Landfill, on the other hand, have each moved for summary judgment on all claims being presented against them. [DE 42; DE 43.] The Court addresses each of these motions below.

## I.     Applicable Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is that which is outcome-determinative. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). In order to prevail, the movant must prove all elements of the cause of action or defense. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). Once that burden is met, however, the opposing party must set forth specific facts showing there is a genuine issue for trial. *Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). Inferences drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–88, 106 S.Ct. 1348, 1356 (1986); *In re Crescent Communities, Inc.*, 359 B.R. 357 (B.A.P. 6th Cir. 2007).

In cases such as this one, where the parties have filed cross-motions for summary judgment, the court must address each motion separately on its merits. *In re Crescent*

*Communities, Inc.*, 359 B.R. at 357. Just because both parties simultaneously argue that there are no genuine issues of material fact, does not mean that a trial is not necessary. *Id.* Moreover, "that one party has failed to sustain its burden under Federal Rule of Civil Procedure 56 does not automatically entitle the opposing party to summary judgment." *Id.* (citing 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure: Civil 3d § 2720 (1998)).

## II.     Plaintiffs' Claim for Specific Performance

All parties have moved for summary judgment on the issue of specific performance. [DE 41; DE 42; DE 43.] For the reasons stated below, the Court **denies** the dispositive motions.

For the Plaintiffs to prevail their specific performance claim, they must demonstrate that Randall Lewis and Gerald Jones had valid and enforceable real estate contracts under Kentucky law and that Laurel Ridge was not a bona fide purchaser for value. *See Kuntz v. Peters*, 286 Ky. 227, 150 S.W.2d 665, 667 (1941). Plaintiffs contend that the October 8, 2013 real estate purchase document concerning the front 17 acres and Jones's December 22, 2015 email constitute binding real estate contracts under Kentucky law. Plaintiffs assert that the purported contracts were sufficiently definite as they identified the real estate to be conveyed and the intentions of the parties. *See Sullivan v. Lay*, 457 S.W.2d 266, 268 (Ky. 1970). Furthermore, they argue that Laurel Ridge does not deserve protection as a bona fide purchaser because it had adequate knowledge of Lewis's claim to Jones's property.

In its response, along with its own motion for summary judgment, Laurel Ridge argues that specific performance is unwarranted. First, Laurel Ridge contends that neither the October 8, 2013 real estate purchase document, nor Jones's December 22, 2015 email, constitute binding real estate contracts because Jones did not intend to be bound by them. In support of this position, Laurel Ridge points to the language of the documents and excerpts

from Jones's deposition where he indicated his belief that the documents were not operable real estate contracts. [DE 44, at 8.] Jones has specifically attested that he viewed the October 8, 2013 as part of Lewis's attempt to secure financing. Moreover, he has indicated that his December 22, 2015 email was merely a memorialization of a prior conversation.

Next, Laurel Ridge claims that the terms included in the alleged contracts were too indefinite to create binding legal obligations. As to the October 8, 2013 purchase agreement for the front 17 acres, Laurel Ridge submits that several key terms were left out of the document, including the right to terminate the contract if financing fell through, the closing date, and the allocation of closing costs. [DE 44, at 10.] Laurel Ridge also highlights the fact that Lewis could not recall at his deposition whether the specific terms of the document were filled in before or after the documents was faxed to Jones for signature.

Laurel Ridge also contends that Jones's December 22, 2015 email is deficient as a real estate contract. To begin, the Landfill argues that the email is "replete with language indicating that the parties had not yet come to terms." [DE 43-1, at 13.] Laurel Ridge specifically points to the second sentence of the email which indicates that the purpose of the communication is to "touch base and get an e-mail so we can share information." [DE 41-11, at 1.] Moreover, the email advises that the like/kind swap involving the back 27 acres was "contingent on [Jones's ability to] get a building permit to allow a cabin type structures to be built." Lastly, as to the interest rate, Jones offered 3.5% but noted that if Lewis felt "differently" the parties could "research and set to .25 lower than the average bank mortgage."

In the alternative, Laurel Ridge argues that even if this Court determines that one or both of the documents at issue are valid real estate contracts, it is protected as a bona fide purchaser for value. This is so, Laurel Ridge asserts, because it made a "reasonable attempt" to determine whether Lewis's claims to the property were valid before closing on the deal.

Laurel Ridge argues that its attorney, Richard Wood, demanded that Jones produce the October 8, 2013 purchase document. Jones, however, indicated that he no longer had a copy of the document. Moreover, Laurel Ridge underscores the conversation between Breeden and Lewis concerning Lewis's claims to the property. At no point, Laurel Ridge argues, did Lewis offer to produce a copy of the alleged contract.

The Court must make three determinations. First, whether the October 8, 2013 purchase agreement executed by Lewis and Jones constitutes a valid real estate contract. Second, whether Jones's December 22, 2015 email constitutes a valid real estate contract. And third, if one or both documents are binding as a matter of law, the Court must determine whether Laurel Ridge qualifies as a bona fide purchaser for value.

This Court may determine the effects of the October 8, 2013 purchase agreement and Jones's December 22, 2015 email without submitting the documents to a jury. *Godley v. Kentucky Res. Corp.*, 640 F.2d 831, 835 (6th Cir. 1981) ("[A]n unambiguous instrument conveying property, or specified property rights, must be construed according to its terms, not according to its creator's intent, and is in and of itself generally determinative of the nature and extent of a conveyance.").

Looking first at the October 2013 purchase agreement, the Court determines that the document is indeed a valid and binding contract for the purchase of the front 17 acres of the property. It was signed by both parties and includes the address, a property description, and a price of $59,500 due at closing. [DE 41-6, at 1.] The Defendants' arguments that the document did not contain all the material terms is unpersuasive. Defendants have not pointed to, nor is the Court aware of, any Kentucky authority standing for the proposition that real estate contracts are void if they do not address earnest money, financing penalties, a closing date, or the allocation of closing costs. Instead, it appears that the "governing principle" under Kentucky law is that the "written instrument must contain sufficient data

to identify the property, so that no question can arise as to the intention of the parties concerning the subject matter." *Id.* at 889. *Burkeen v. McKinney*, No. 2009-CA-000612-MR, 2009 WL 3321416, at *2 (Ky. Ct. App. Oct. 16, 2009). It is the Courts view that the October 8, 2013 real estate purchase does just that.

The Court, however, reaches the opposite conclusion with respect to Jones's December 22, 2015 email. Jones's email, as opposed to the October 8, 2013 real estate purchase document, contains precatory language and is littered with contingencies. One need not look any further than the second sentence of the email in which Jones states that he "just wanted to touch base and get an email so we can share information." This is not the type of language that one would expect to see in a real estate contract, or even an offer for that matter. [DE 41-11.] Instead of a contract or offer concerning real estate, the Court finds that that Jones's December 22, 2015 email was simply a memorialization of his prior conversation with the Lewises. Further, because the terms of the email are too indefinite to constitute even an offer, the Court need not wade into the issue of whether Lewis accepted the offer via telephone.

Having found that the October 8, 2013 real estate purchase agreement constituted a binding real estate contract, the Court must determine whether Laurel Ridge was a bona fide purchaser of the front 17 acres. *See Kuntz*, 286 Ky. at 150. Despite the contentions of both sides, the Court finds that genuine issues of fact exist regarding Laurel Ridge's status as a bona fide purchaser so as to preclude summary judgment.

Under Kentucky law, a party takes real property despite an existing claim, if they are a bona fide purchaser for value. A bona fide purchaser for value is a party having neither actual nor constructive notice of any defect in title and who gave valuable consideration for the purchase of the real property. *Kitchens v. Pendley*, No. 2013-CA-000209-MR, 2014 WL 3548375, at *1 (Ky. Ct. App. July 18, 2014).

Laurel Ridge submits that it qualifies for bona fide purchaser protection because it

made a reasonable attempt to determine whether Randall Lewis had a valid and legally enforceable interest in the front 17 acres. [DE 44, at 14.] As evidence, Laurel Ridge asserts that its attorney, Richard Woods, reached out to Jones and requested the alleged October 8, 2013 real estate purchase contract. Jones, however, failed to produce it. Moreover, Laurel Ridge's Nelson Breeden had a discussion with Randall Lewis regarding his alleged contracts on Jones's property on May 25, 2016. Laurel Ridge claims that Nelson Breeden asked Lewis for a copy of the purchase agreement during the conversation. A review of Lewis's deposition, however, reveals that this fact is in dispute.

Q: Did he request you to provide him . . .

A: No, he didn't.

Q: . . . a contract?

A: He told me it was a done deal

. . .

Q: At any point did you provide a contract or written proof that there was an agreement here?

A: No

Q: That's all I have.

A: One was not requested either. [DE 42-2, at 60.]

Laurel Ridge further suggests that it never saw a copy of the alleged purchase agreement and that the first time it learned of Lewis's purported interest in the front 17 acres was when its surveyor reported that Lewis had expressed to him that he had contracts on the farm. [DE 43-1, at 19] ("[H]aving received no confirmation of the continued existence of even the BB&T [purchase agreement] form, Laurel Ridge acted in good faith in proceeding to perform on its contract with Jones.] Though the landfill claims it was caught off guard by Lewis's claim to the front 17 acres, Jones's deposition indicates otherwise. At multiple points

in his testimony, Jones indicated that the October 8, 2013 real estate purchase document at issue was sent to Laurel Ridge well before the deal had closed.

> Q: Did you ever tell anybody from the landfill, Nelson Breeden or anyone else, about this document, the October 2013 document?
>
> A: I informed them of it. Nelson, I shared that with him. He said he wanted to do a consult in-house with his legal team. And he returned to me in about five days and said that was not a contract withholding and they had no trouble in continuing forward . . . .
>
> . . . .
>
> Q: But you did actually give Nelson Breeden a copy of this document?
>
> A: I did send that document to him. And again, we discussed it. He wanted to consult in-house with his legal team. And again, he returned in approximately five days and said there was no issue with that. That it was not substantial or not – not a legal document and they chose to continue forward.
>
> ...
>
> Q: Had they made an inquiry with you about what you called the price agreement with Randy Lewis?
>
> A: That's the document I had sent them previous. And yes is the answer. And that's the document that Richard Wood, the attorney, took to his firm and came back about five days later and said that does not substantiate a sales contract, we're fine with going forward.
>
> ....
>
> Q: Okay. So I'm a little confused by your answers. Did you actually show this document, Exhibit D, to Nelson Breeden or Richard Wood?
>
> A: I have never met Nelson Breeden. It was faxed to Richard Wood's law firm.
>
> . . . .
>
> Q: . . . Other than what you have told us, was there a back and forth?
>
> A: No, there was not.
>
> Q: No?
>
> A: There was just the one conversation in that period of time and then he came back. They had obtained that. If I did not provide it to them – Mr. Richard

Wood, I can't recall how, but he had access to that document. [DE 42-1, at 59-72.]

In sum, there are genuine issues of material fact as to whether Nelson Breeden asked Lewis to produce the October 8, 2013 purchase agreement during their May 25, 2016 phone call and whether representatives of Laurel Ridge viewed the purchase agreement document before closing the deal with Jones. As such, there is a genuine issue of material fact on the broader issue of whether Laurel Ridge qualified as a bona fide purchaser for value.

## III.    Plaintiffs' Breach of Contract Claim

Because the Court finds as a matter of law that Lewis and Jones entered into a valid and binding real estate contract for the purchase of the front 17 acres, and the property was instead sold to Laurel Ridge, the Court **grants** the Plaintiffs summary judgment on their breach of contract claim against Jones.

## IV.    Plaintiffs' Unjust Enrichment Claims

Plaintiffs' Amended Complaint asserts claims of unjust enrichment against Defendants Gerald Jones and Laurel Ridge. Per Kentucky law, to prevail on their unjust enrichment claims, the Plaintiffs must demonstrate: (1) a conferral of a benefit upon the Defendants at Plaintiffs' expense; (2) a resulting appreciation of the benefit by Defendants; and (3) inequitable retention of benefit without payment for its value. *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009). As noted in this Court's previous Order, a showing of an indirect conferral will not suffice. Rather, Plaintiffs must demonstrate that they conferred a benefit *directly* on the Defendants. [DE 38, at 10.]

Plaintiffs contend that during the lease period, Randall Lewis made certain improvements to the front 17 acres, incurring significant costs in the process. The general tenet of their argument appears to be that the improvements to the front 17 acres were

enjoyed, first by Jones, and then by Laurel Ridge after the sale—neither of whom compensated the Plaintiffs. The Court now addresses the claim as to each Defendant.

As to the unjust enrichment claim against Laurel Ridge, the Court determines that there is nothing in the record suggesting that Laurel Ridge paid below market value for the property. Indeed, it has been argued that they paid well above it. Thus, no reasonable argument can be made that Laurel Ridge did not pay for the alleged improvements to the land. *Jad Farhat Irrevocable GSST Tr. #1 v. TTM Grp., LLC*, No. 2016-CA-001937-MR, 2018 WL 1980764, at *6 (Ky. Ct. App. Apr. 27, 2018), review denied (Sept. 19, 2018) ("Because [defendant] paid full market value for the property, element (3) of *Jones*, requiring retention of benefit without payment for its value[,]" was not met.") (internal citations omitted).

The Plaintiffs' attempts to attribute liability to Laurel Ridge under a constructive trust theory also fail. This is because Plaintiffs have failed to show that a "confidential relationship" existed between Lewis and Laurel Ridge at the time of the real estate transactions at issue. *Keeney v. Keeney*, 223 S.W.3d 843, 849 (Ky. Ct. App. 2007) ("It is true . . . that Kentucky courts have required the party seeking the imposition of a trust to establish a 'confidential relationship' with the party upon whom the trust is to be imposed."); *see Kerns v. Beam*, No. 3:15-CV-212-DJH-DW, 2018 WL 2449206, at *6 (W.D. Ky. May 31, 2018). As such, the Court grants Laurel Ridge summary judgment on this issue and dismisses the unjust enrichment claims brought against it.

The unjust enrichment claim brought against Jones fares much better. Though Jones has moved for summary judgment on all claims, he did not make any arguments (or even mention) the unjust enrichment claim pending against him. Moreover, Jones cannot incorporate Laurel Ridge's arguments as his own because for the most part, they do not apply to his situation. As such, the Court will allow Plaintiffs' unjust enrichment claim against Jones to proceed.

## V.        Plaintiffs' Negligent Misrepresentation and Fraud Claims

Plaintiffs assert claims of negligent misrepresentation and fraud against Defendant Jones. While Jones has moved for summary judgment on all claims, his submissions to the Court to do not specifically address the counts of negligent misrepresentation and fraud being raised against him. With no arguments to review, the Court **denies** Jones's motion for summary judgment as to these claims. Accordingly, they will proceed to trial.

## VI.        Plaintiffs' Tortious Interference with a Business Advantage Claims

Defendants Laurel Ridge and Jones have moved for summary judgment on the tortious interference claims being raised against them. Under Kentucky law, in order to maintain a claim of tortious interference, a plaintiff must show: (1) the existence of a valid business relationship or expectancy; (2) the defendant's knowledge or awareness of this relationship or expectancy; (3) the defendant's intentional interference with the relationship or expectancy; (4) an improper motive behind the interference; (5) causation; and (6) special damages. *Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 306 (6th Cir. 2011).

The parties here spar over whether the Amended Complaint sufficiently alleges an improper motive, i.e. malice. Defendant Laurel Ridge claims that the motivations behind the real estate purchase were benign and that the company was entitled to aggressively pursue its business interest. Plaintiffs argue, on the other hand, that "Laurel Ridge surreptitiously sought to expand the landfill at all cost" and sabotaged the deal in order bring the landfill to the "Lewises' doorstep" [DE 47, at 18.] Further, the Plaintiffs appear to argue that the fact that Laurel Ridge paid over 200% above its appraised value tends to show nefarious intent. [DE 47, at 18.]

After a review, the Court finds that Laurel Ridge pursued Jones' property, not out of spite for Jones, but because it wanted to sustain and expand its future operations. At first glance, the $875,000 paid by Laurel Ridge for Jones's property appears to be a staggering

figure—especially when compared to the farm's $350,000 appraisal. However, the record reveals that the land was appraised for general use and not for its specific value to the Laurel Ridge Landfill. Moreover, the value of Lewis's offer for the entire farm, which included his Harlan, Kentucky property, had an estimated value near $600,000. Taking these facts into account, the $875,000 purchase price does create an inference of impropriety sufficient to defeat summary judgment.

The tortious interference claims against Defendant Jones must also fail. It is black letter law that a party cannot tortiously interfere with its own contract. *Rawlings v. Breit*, No. 2003-CA-002785-MR, 2005 WL 1415356, at *3 (Ky. Ct. App. June 17, 2005) (citing *Rao v. Rao*, 718 F.2d 219, 225 (7th Cir. 1983)).

In sum, the Court **grants** the Defendants' summary judgment motions as to the Plaintiffs' claims of tortious interference against them.

## CONCLUSION

For the reasons listed above:

(1) the Plaintiffs' motion for partial summary judgment [DE 41] is **granted in part and denied in part**;

    a. Plaintiffs' motion for summary judgment on the issue of specific performance is **denied**;

    b. the Plaintiffs' motion for partial summary judgment on the issue of breach of contract is **granted insofar as it pertains to the front 17 acres of the Jones family property**.

(2) Defendant Laurel Ridge's motion for summary judgment [DE 43] is **granted in part and denied in part**;

a. Laurel Ridge's motion for summary judgment on the issue of specific performance is **denied**;

b. Defendant Laurel Ridge's motion for summary judgment regarding Plaintiffs' unjust enrichment claim against it is **granted**;

c. Laurel Ridge's motion for summary judgement regarding Plaintiffs' tortious interference claim is **granted**.

(3) Defendant Gerald Jones's motion for summary judgment [DE 42] is **granted in part and denied in part**;

a. Gerald Jones's motion for summary judgment on the issue of specific performance is **denied**;

b. Gerald Jones's motion for summary judgment regarding Plaintiffs' unjust enrichment claim against him is **denied**;

c. Gerald Jones's motion for summary judgement regarding Plaintiffs' negligent misrepresentation claim against him is **denied**;

d. Gerald Jones's motion for summary judgment regarding Plaintiffs' fraud claim brought against him is **denied**;

e. Defendant Gerald Jones's motion for summary judgment regarding Plaintiffs' tortious interference claim against him is **granted**.

Dated March 13, 2019.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY